Mr. Tolchin, I'm happy to hear from you. Good morning, Your Honors. I'm Ed Tolchin. I represent the appellant in this case, Cortel of Virginia. We're here appealing a summary judgment decision that was issued in the Eastern District of Virginia. Now, it's our position that what the district court did was make findings of facts regarding disputed matters, and those disputed matters were genuine disputes about material issues, and that's why we're here. There are really three issues that the court decided, and one of those three issues is divided into two sub-issues. We call it facilities, switched access, and reciprocal compensation, and I'll try to address it in that order. Facilities are divided into two different aspects. There's our facilities, and there's Verizon's facilities. Now, what's very odd in this case is that Verizon's position, and indeed the position adopted by the district court on summary judgment, is that Verizon can charge the highest compensation that exists out there in their tariffs for interaction to their facilities, for an entrance into their facilities, but Cortel can't charge anything for the entrance facilities it provided to Verizon, not at the highest rate, not at the lowest rate, at no rate. Well, those are two separate questions, aren't they? They are separate but interrelated. Well, I understand, but in order to make the argument, you're going to have to start with the notion of the contract. This is a contract case. This is a contract case. 3.4.3 provides the two alternative rates or any rate that's agreed upon, but we're talking about either the tariff rate or the cost rate. True. And the question then is, what does that mean? The question then is, what does that mean? The tariff rate, I mean, the cost rate is listed in exhibit A for unbundled services, facilities, and is labeled as such under Roman numeral II. And if you take those away, then you don't have any cost rates. And so the question is, did that agreement continue to apply the unbundled rates in exhibit A? And I think that Verizon's point is, and this is what I'd like you to address, is that when the agreement was adopted, the unbundled rates were eliminated. Okay. Could I just, the predicate to that question, is that correct, that if you take away tell rent rates for unbundled elements, that that's the end of the inquiry? No. I just wanted to make sure you knew that that wasn't, or at least I think that's an open question. No, it's not. And let me explain by beginning to focus the court on the, I'll come back to the history, but let me focus the court first on the interconnection agreement, the ICA itself. If you look at the ICA, and what you're referring to is the list of charges in exhibit A. What I really want you to focus on, I've read the agreement fairly carefully, and I'm happy to have you argue it, but my question is really directed at the adoption agreement. And the adoption agreement makes the statement that for avoidance of doubt, adoption of the terms does not include adoption of any vision imposing an unbundling obligation on Verizon. And it seems to me that that was, whether the law did make a change or not, the parties thought it made a change and was not adopting any unbundling obligation. Now, if you don't have a bundled obligation, Verizon's argument is then the rates are the tariff rates. But the problem is. Well, that's their argument. I want you to address it. Isn't that what they argue? That's their argument. Okay, fair enough. But what that does is it confuses two separate matters. One is unbundling and bundled, the unbundling network elements, the UNIs, and the second is interconnection. What Talk America made absolutely clear is that those are two separate matters. Just because unbundling goes away, interconnection still continues to exist. And that's what Talk America said. And when the FCC filed its. . . We're looking at an agreement. Let's stick with the contract. Correct. The briefs I found to be a little difficult because they started arguing what the law was. And this is a straightforward contract case. We're reading a contract as adopted in November of 2004 and 2005. Judge, you have the contract in front of you. Look at Section 3.1 if you would. Just take a moment if you can. If you look at Section. . . Tell me what it says. It says there that this ICA covers both interconnection and UNIs. It covers both. And when it covers. . . I understand, but I'm just asking you this. I would like you to address their argument, which is this, that the big debate is under 3.4.3 as to what rate. . . There's two rates referred to there, a tariff rate and the cost rate, the TELRIC rate. And the question is what applies because they're in the disjunctive. Their argument is before the adoption, the TELRIC applied explicitly. It was attached to the Exhibit A as part of Exhibit A. They acknowledge that. But they argue that when that agreement was adopted, there was a modification made in the adoption letter. That's at 359. And that adoption letter modified the agreement. Now, why doesn't it? It doesn't modify the agreement because it doesn't take away the interconnection rights which are stated in the agreement, and that's Exhibit A that you're referring to. It has TELRIC rates that apply to both interconnection and unis. If you look at Exhibit A. . . I'm sorry. No, go ahead. If you look at Exhibit A, it's just because it has a heading, unbundled transport, is irrelevant. No, no, you're not focusing on what I want you to focus on. The adoption agreement got rid of all unbundled rates. We're not talking about unbundled. It's irrelevant. There is nothing about unbundling that has any relevance to this case. Hold on a minute. Judge Duncan has a question. Yes. The proviso specifies that the adoption of the terms doesn't include adoption of any provision imposing an unbundling rate. There's a qualifier to that that no longer applies to Verizon under FCC orders, including the triennial order review. And what Talk America makes clear is that it appears that, although it eliminated unbundled access to entrance facilities as unis, but not as . . . Interconnection. . . . as not for interconnection or what they call . . . Well, going back. Entrance facilities are used for interconnection, but they're also used for backhauling. Yes. So you can have them used for different things is the point. So the premise that the proviso takes out all unbundling obligations, it doesn't really hit. It doesn't address the interconnection point. So the question is whether CORTEL ever purchased unis . . . Well, ever purchased entrance facilities as unbundled network element or for interconnection because they're two different things. Correct. And if you look at every order that was placed, every order that was placed was an order for an entrance facility for interconnection at tower grates. Look again. Look at the . . . We gave one example at the appendix on 196. The way orders were placed was through an ASR system. It was called the Access Service Request System that Verizon maintains. That order says explicitly we want interconnection at tower grates. That's what we're ordering. We're not ordering unis. Unis are completely irrelevant to this case. If you look at 965, 968, and 970 of the appendix, if you look at those, those are the letters that first were sent by CORTEL to Verizon of Virginia saying CORTEL Virginia wants to order interconnection at tower grates. It says it explicitly. This is what we're ordering. We never ordered a uni. We never wanted a uni. We had nothing to do with unis. And the TRO only deals with unis. And getting back to your question, this interconnection agreement provides for interconnection at tower grates because if you look at Exhibit A, just because it says unbundled transport, unbundled transport is used for both unis and interconnection. And, in fact, if you look at the Triennial Order, the TRO, and specifically at Section 365 of the TRO, it says that explicitly. I'll read it to you. I'll only read bits and pieces of it because it's too long. But competitive LECs often use transmission links, including unbundled transport. That's the word that you were focusing on. Competitive LECs also use transmission links, including unbundled transport. Competitive LECs use these transmission connections between incumbent LEC networks and their own networks both for interconnection and the back home. They use it for both. Those unbundled transport is used for both. And the other question, you say that the interconnection agreement, the ICA provides interconnection at TELRIC. Yes. And that is what was your quote, what was your cite for that? Well, the ICA provides it at 4.3, and then in the Exhibit A it provides the TELRIC rates under the category unbundled transport, but unbundled transport includes interconnection and the unis. That is what the definition of it is. And in any event, the headings are irrelevant. But besides that, that's exactly what we're talking about here. Is there a dispute about whether or not CORTEL purchased the entrance facilities as a uni or for interconnection? There is no dispute whatsoever. Every document, every order that was issued was issued for interconnection with an entrance facility at TELRIC rates. There is not a single document in which anything else is said. So to the extent that summary judgment was appropriate, summary judgment was appropriate for CORTEL, but clearly there's no right to summary judgment for Verizon because there is, at worst for CORTEL, a disputed as to what we ordered. And, in fact, as I said, every document says we ordered interconnection at TELRIC rates. What's your argument as to where the district court went wrong on this issue? This court went wrong, well, we're here to know, Wilco. On this issue. On this issue, what the district court did is it bought the same confusion that Verizon tried to sow between unis and interconnection. They're two separate things. It didn't make any distinction between purchase for the two purposes. It made no distinction. It just lumped it all together. And then what it said is that Verizon was providing these pursuant to an ICA that didn't have any rates for interconnection. And that's just not true. It's just wrong. So, again, you look at- Where are the rates? Exhibit A. Exhibit A. Under what you said is unbundled transport, but unbundled transport doesn't mean unis. It simply means this is how transport works. Look at section 365. It says it explicitly in the TRO. It says that explicitly in the TRO. But besides that, if you just think about it, if you think about it, what we did is when we first opened this system up in Virginia, we told them that we wanted interconnection at these rates, at these tower grades. Verizon's response, if it was accurate that it's-if their argument now is true, Verizon's response back then should have been, well, we need to amend the agreement if that's what you want. But they didn't. Because as soon as we ordered it, they said we're providing it. But then they started sending bills at the higher rate. But under the agreement, if they're right- I'm looking at Exhibit A. Show me the rates that you think are applicable. If you look at- It says entrance facilities on the first page, I believe, of Exhibit A. If you look at-I think it's 324 of the appendix. Well, the first page is 322. Page 324 of the appendix, which is maybe the third page of the exhibit. Do you see the work-do you see the entrance facilities there? Yeah. Those are tower grades. And that is what they refused to charge us, even though that is what we ordered. One of the things that concerns me is the contract seems-it just seems less explicit than one would hope with respect to what rates apply to what orders. You know, you ordered-I mean, we have the fact that tailor-rick rates in the contract may apply only to unbundled facilities and that Cortel ordered entrance facilities in a bundled state. But that's still an argument by implication, isn't it? No. Well, it's based in part on the distinctions made by the FCC orders, which are incorporated into the agreement. Correct. These are highly technical terms. And when these companies entered into this agreement, they were entering into it on the theory that everybody understood what these were. And everybody understands that these rates apply across the board. The contract itself never seems to explicitly say what either of you-what either side indicates they wanted to say. Because it was-because this contract was entered into in the area of 251C. Everybody knew 251C was part of this contract, and 251C is explicit. So when you enter into a contract, you enter into it with the idea that the law applies to it. Let me follow up there. You pointed me to entrance facilities which are part of the unbundled transport rates. Again, if you want to give the headings credit, but okay, yeah. You've got to. That's what it's identifying here. Section 2.0 says you don't give headings credit, but- I understand, but that's what it's describing. This whole section, Roman numeral 2, is dedicated to unbundled transport. Okay. And under unbundled transport, it has entrance facilities, and you've explained to me that the rates there are TELRIC rates. Correct. Now I take you back to 359, which says the unbundled rates are in adoption. We're not adopting the unbundled rates. The UNI rates, the unbundled network rates. But unbundled transport applies to both UNIs and interconnection. That's the difference. Well, facilities purchased as UNIs and facilities purchased for interconnection. Again, the TRO says that explicitly, and that adoption agreement is simply reflecting what the TRO was saying. And the TRO, and again, I refer you to 365 of the TRO, where it is 100% explicit. Well, I don't see where it says. It says, for avoidance of doubt, adoption of the terms of that contract does not include adoption of any provision imposing an unbundling obligation on Verizon. That's UNIs. Because the TRO said there's no unbundling obligation. Hold it. That doesn't say that. That's categorical. That knocks out all the unbundling rates. No, but it knocks out unbundling network elements, UNIs. Where does it say that? It knocks out unbundling obligations that no longer apply. Well, that's the interpretation of the parties. Well, the proviso says that it doesn't include adoption of any provision imposing an unbundling obligation that no longer applies under FCC orders. Which are the TRO. Right, and which is Talk America. Right, but interconnection still applies under those orders, and unbundled transport is used for both. Except the way I read this is that the parties assumed, incorrectly maybe, what those terms, those orders. But they basically said any unbundling obligation. Right. And it's not restricted. That no longer applies is because those acts were ended, and the parties could have been misconstruing the scope of the orders. But the amendment is not so restricted. Okay, so. The Triennial Review Order concludes, as did the Supreme Court in Talk America, that the relevant market is sufficiently mature to no longer require ILECs to provide unbundled access to entrance facilities purchased as UNIs. Right. But not for interconnection. Right. But you still have to interpret the contract. That's just what the law did. The parties can agree on whatever they want. This is a contract case, and I was very, found it very difficult to get through this case because there was so much law argued, and yet the parties set forth in detail what they agreed to do and what they agreed not to do. And they referred to tariff rates. Right, but look at that. And there's an alternative, tariff rates or tell rate rates. But look at that adoption agreement, Judge. I did. Please. And if you look at that adoption agreement, it doesn't say unbundling and end. It's talking about the FCC orders. So you have to read it in the context of the FCC orders. That's what the parties are talking about. It says why. It's explaining why they are unbundling. Sure. But the language of the adoption does not limit it. It says any unbundling obligation. By the FCC orders. That's what it says. We're not talking about unbundling in the department store. We're talking about unbundling in the communications world under the FCC orders. And that's what it's referring to. You have to read every document in context. If you read something out of context, you can make it. Thank you, Mr. Toten. Okay. Thank you. Mr. Angstreich. Thank you, Your Honors. And may it please the Court. Judge Duncan, Judge Niemeyer, Judge Wilkinson, if I can start with the Trianor review order. Please. And could you just eliminate one just factual basic question. Sure. It is not your position, is it, that entrance facilities can be ordered either as an unbundled network element or for interconnection. Are we good there? They can be put to that purpose, yes. Well, I can't let you get away with that because that's not what Top America says. Your Honor, if I can try to clarify my answer. Please. This was a 2002 contract drafted as the law existed in 2002. Right. In 2002, no one thought that there was an independent TELRIC pricing obligation under Section 251C2. So that independent obligation is nowhere reflected in this contract. A key distinction that the FCC drew in 2003, which it then seven years later decided created this new obligation, is that if you buy an entrance facility under Section 251C2, you can use it for fewer purposes than if you buy it under the old rules under C3. There is not a single provision in this contract that reflects those more limited purposes. And again, there's a reason for that. When this contract was written, the only way anybody ever bought TELRIC-priced entrance facilities was as unbundled elements used for both interconnection and backhaul. That's what's in Section 11.6. There's provision after provision in Section 11.6 of this contract detailing how one would use them. If CORTEL wanted to take advantage of this new obligation under Section 251C2, it had to write a new contract. I do understand your argument, but it's not responsive to my question. I'm sorry. I'll try again. No. I'll go after this. I'm after your question. Yeah. The agreement with Cox provided for the purchase of unbundled entrance facilities at TELRIC. At Section 11.6, yes. Right. In the agreement with CORTEL, Verizon had a proviso that the intervening FCC order in review of the Section 251 unbundling obligations of incumbent local carriers to reflect the changes that that order, all of these contracts are amended in conjunction with and to reflect the evolving- I think that overstates it, Your Honor. The way I had to read that section is that rather than going through the contract with a black marker and striking out the specific provisions that no longer apply as a result of the intervening orders, we are saying you should read this contract understanding them to have been stricken out. We are not, through this proviso, adding to the contract any provisions. CORT has never argued that this adoption letter added to the contract provisions that are not there currently. And the proviso says that the adoption of the terms of the Cox contract does not include an adoption- a provision providing an unbundling obligation that no longer applies with reference to the FCC orders. Yes. So the FCC orders, as they evolve, are effectively, even as you express it specifically in the proviso, are effectively incorporated. Your Honor. What does the proviso mean when it says that no longer applies under, among other things, the triennial review order? Absolutely, Your Honor. In this agreement is Section 11.6. What Section 11.6 says expressly is that CORTEL can buy entrance facilities as unbundled elements at the rates in the pricing attachment. This proviso says strike those provisions from the contract. And my question is a factual one because I'm not suggesting that I necessarily buy the argument that CORTEL is entitled to judgment as a matter of law. But it seems to me that the contract, as you acknowledge, CORTEL, there doesn't seem to be any dispute, cannot order an entrance facility as an unbundled network element at anything other than tariff. Your Honor, our position is once you strike out Section 11.6 from the contract, there are no other provisions in the contract. It doesn't say that. Your Honor, it doesn't say it does not include. It doesn't say it includes things in the order that aren't found in the contract. Well, isn't it at best unclear because you have the unbundled transport facilities? But the problem that I'm having is precisely that when you say that the unbundling obligation no longer, that you're limiting the proviso to only those unbundling obligations imposed by the FCC, and the FCC specifically references or referenced in the proviso explicitly says that while entrance facilities do not generally need to be offered at TELRIC as unbundled elements, they must still be provided on that basis for interconnection. Not on that basis, Your Honor, not as unbundled elements. This is, again, a critical thing that the FCC made clear seven years later in its amicus brief. If a competitor is going to buy an entrance facility under Section 251C2, it is not buying it as an unbundled element. It is buying it as something different for a limited purpose. And my only point here, Your Honor, is that CORE's argument has never been that it's unclear the extent to which the adoption letters import into the contract things in subsequent FCC orders. CORE tells position has always been the contract's already included provisions. No. That give them the right to this Section 251C2 duty. And our point has always been there is no provision in this contract that implements a Section 251C2 duty to use entrance facilities for the limited purpose of interconnection and interconnection only at TELRIC rates to implement that provision. But the FCC obligated incumbent ILACs to provide interconnection at cost. That was the purpose. I mean, that was basically the purpose of the statute. But that was announced, again, after this contract was written. At the time, Your Honor, at the time CORTEL adopted this contract, only one state commission had considered the question of whether the C2 duty exists. It was Illinois, and it said it didn't. At the time CORTEL adopted the contract a second time, three more state commissions had weighed in. Two more of them had said it did not give them this right. If CORTEL wanted a contract that included provisions that implemented this Section 251C2 duty, it had to either find one preexisting or it had to use the process in the act to negotiate its own contract. The FCC makes clear that the background provisions and principles of the law are not what govern the two companies' rights with respect to each other. It is the words in the contract. And CORTEL, they point to Section 3.1. Section 3.1 does not say Verizon will provide interconnection at telework. It just says it will provide interconnection. There is no provision in here, no comparable provision to Section 11.6, that specifies CORTEL may buy an entrance facility for interconnection, but it is prohibited from using that entrance facility for backhaul. That's the kind of provision you would expect to see in the contract. It's not there. So Cox had no right to use, to purchase entrance facilities for interconnection purposes? Under the 2000 contract, of course it did, but it bought them as unbundled transport under Section 251C3. I think it's critically wrong. Where is it? That would help me immensely because it does not appear that the district court recognized the distinction in the usage or the ability to purchase entrance facilities under two different rubrics. Your Honor, I respectfully disagree. I think what the district court recognized is that when you pick a contract from 2002. It didn't articulate it. There's no, I can't find this. And part of the problem that I'm having is the lack of clarity on this particular point. Well, Your Honor, if you look at the FCC order from 2002 that led to the creation of these agreements, and it's typically paragraph 17. The FCC explains that AT&T wanted to buy entrance facilities and transport for interconnection. It's paragraph 217. Where did AT&T see and the FCC staff see AT&T's right to do that? Section 251C3 and the unbundling rules. That obligation is reflected in section 11.6 of the contract, which is part of the unbundling section of the contract. And which says in 11.6.1.1, it's on JA255, that Cox could buy dedicated transport that provides connections between its switches and Verizon's. That's what an entrance facility is. And it refers, all of section 11.6 refers you to the unbundling prices in the back of the agreement. Those are the provisions that implement paragraph 217 in that duty. It's telling. AT&T didn't say, oh, and by the way, even in addition to section 251C3 and the then existing unbundling rules, we also have a duty under section 251C2, and we'd like to put provisions in the contract. So what does unbundled transport mean? Unbundled transport means effectively they get the use of Verizon's network as though it were their own, to put to any purpose whatsoever they so choose. Interconnection, backhaul, transporting data between their own network facilities, whatever. It's as if they built the pipe themselves. If you buy an entrance facility under this new section 251C2 duty, which was not recognized when this contract was written, and therefore is not unsurprisingly reflected in it, you may use it only for the purposes of exchanging calls between the two networks. You would think that if this contract implemented that duty, you would see those words somewhere in this contract, and they're not. But you're not, you are now arguing as you suggest, that we read it in historical and administrative context. I agree. What I don't, what is less clear is that it comports with your reading of it, given the extent to which the FCC has carefully spoken to continue to encourage or to make the distinction between requiring the purchase of entrance facilities as unis, as the market matures, and competition is more likely to take care of exerting downward price pressure and imposing the obligation to provide them as an interconnection agreement.  Contracts written after 2005, and especially after Talk America, include express provisions that detail how one buys an entrance facility under this section 251C duty, and the limitations on the use of it, and have rates generated specific to those uses. That's not this contract, because again, in 2002, no one thought that duty existed. And that's why there is no provision in the contract that says you could, because under Coors View, there were four ways that Cox could have, I mean, this is, under Coors View, there were four ways that Cox could have bought an entrance facility under this agreement. Either as an unbundled element, which he could use for any purpose under the sun, or as a 251C2 entrance facility, which he could only use for a limited purpose, or under the tariff, or under some subsequent agreement. And I can find provisions in this contract that talk about how one orders an entrance facility as an unbundled network element, but there is not a single provision in the contract that talks about how one orders it to implement this 251C2 duty. If they wanted the provisions, they had to put it in there. What about 4.3.3 that essentially says, the court may order entrance facilities for interconnection. I think that's what they say. Any of the interconnection methods. In accordance with the rates and charges set forth. More than that, John. In accordance with the order intervals and other terms and conditions, including without limitation, rates and charges set forth in the agreement. I read that, given that it comes right out of paragraph 217 of the FCC's order, to refer you to section 11.6. That's the only provisions in the agreement that discuss how one orders, what the limitations on it are. There's no second section that says, nor is there, and one would think there would be a separate rate for a facility that could be used for limited purposes. Verizon, for example, would have to be able to monitor to make sure Cortel's only using it for the purposes where it was entitled to use it for under this C2 duty. They're just not in the contract. Cortel had lots of ways it could have gotten this provision in the contract. It chose to use none of them. I can't, then I don't understand your interpretation of 4.3.3, which seems pretty, or it certainly makes it puzzling. Well, Your Honor, again, set forth in the agreement, the only rates, terms, and conditions set forth in the agreement that deal with the use of entrance facilities for interconnection are section 11.6 and the associated prices. Those are the provisions that set forth the order intervals, the point of order intervals, terms and conditions, and rates. It's just it. Cortel is suggesting that that rate that's called, as Judge Niemeyer noted, an unbundled transport rate, part of the unbundling rates, was actually also, unmentioned to anybody, a rate for this other thing, this section 251 C2 entrance facility that is not an unbundled element, that can only be used for a very limited purpose. Okay. And yet nobody thought to write any provisions in the contract to talk about any of that. Cortel is trying to add to a 2002 agreement a legal requirement that did not exist in 2002. There's a way to do that under the contract. There's a change of law process. When did that brief come in? According to an FCC brief in 2010, it came in when the FCC first dealt with it in 2003. That's, I mean... In the intervening time period, there was lots of disagreement among the state commissions that had addressed the issue. And as I said, when Cortel was adopting these agreements, only four state commissions had dealt with it, Illinois, Texas, Kansas, and Missouri. The first three of those had ruled that Cortel disagreed with the ultimate position that the 2010 FCC took as what the Supreme Court viewed as something to defer to. If I understand your argument, it is that the 2002 agreement, which is the substance of this agreement, subject to the adoption letter, that the 2002 agreement went as far as any obligation was known to exist, and there was no obligation that Cortel now claims the right to get TELRIC rates... That's right, Chuck. For anything? Unbundled, except under... Except under C-3, yes. Except there's unbundled elements. That was the duty known at the time. That was how competitors bought entrance facilities at TELRIC rates at the time. And so that when the adoption letter was made, that's all it could be referring to? All it's referring to is strike out the provisions of the contract that deal with obligations that no longer exist. And 11.6 incorporates Exhibit A. It does indeed, Your Honor. If I could move on to deal with the other three issues briefly. As far as Cortel's facilities bills to Verizon, there's no dispute that those facilities that Cortel belatedly billed for are on its side of the interconnection point. The district court was right to point to Section 422, which says the way Cortel gets paid for those facilities is by charging for the individual calls that are routed over them, not for the facilities themselves. I'm so sorry. I know it's... I don't mean to sound argumentative, but I just think I'm just having difficulty... ..conceptualizing what you're saying in the context of the pricing requirements imposed by the Telecommunications Act. The reason I'm having a difficulty is that you seem to be saying that the contract didn't require an ILEC to provide interconnection... ..and 251C2 just makes that untenable. Let's be very clear on it. There's lots of ways for interconnection to occur. If, for example, Cortel deployed its own entrance facilities, there's still work Verizon has to do to hook those up. To the extent there were any charges for that work, that would be at TELRIC rates. The notion that that C2 duty not only included the duty to let somebody interconnect with you, but to actually provide to them the facility that they would use to do it was unheard of until the FCC... Honestly, Your Honor, unheard of from the FCC until 2010 when it announced in an amicus brief that that's how one should understand its 2003 order. ILECs must provide interconnection and unbundled access. How does it do that except through a facility? Your Honor, it depends on the facility. To interconnect two networks, you not only need the wire that spans the physical distance between the two buildings, but you need all sorts of things to attach to the wire. Verizon, for example, has an obligation to modify its network, the receptacles one, you could think of them, so that they can accommodate third-party interconnection in ways that didn't exist before the act. That's what the existing rules that were in place in 2002 imposed a duty. Verizon has to let a competitor stick its equipment in Verizon's own building. That's a new obligation. Those are all obligations, and this contract talks about those. But the notion that Verizon, above and beyond that, had to actually hand over a facility to another company to use for this narrow, limited purpose, unknown in 2002. And that's why when AT&T, the most sophisticated of any of the competitors that we ever dealt with in these interconnection agreement negotiations, doesn't say, oh, by the way, we have this other right under this other section, I think it confirms what the FCC said to the Supreme Court in its amicus brief, that its original rules didn't impose this obligation and that it wasn't until 2003 that it had any occasion to think about it. And again, it wasn't until 2010 that it told the world that that's what it meant. I very much appreciate your patience. Thank you. Let me ask you on the second point you were just addressing. How would Cortel bill just for the calls? In other words, one of the problems they complain about, the calls weren't identified, they didn't have the data to separate out the calls for which they would bill you for. First, Your Honor, for some of the calls, they did have the data and they didn't use it. But even for the calls where they don't have the data, the industry deals with that all the time through billing factors. Unlike your retail bill or my retail bill, where you expect to see your actual calls, inter-carrier billing deals with millions and tens of millions of calls every month. Precision is a best-effort system. Companies routinely use billing factors. You do a study, you update the study every six months. You say, well, we're going to assume 40% or 60% or whatever comes out of our precise study. There are ways to do it. They're time-consuming, which is, again, why people use billing factors. But the contract is clear. As far as reciprocal compensation charges, they can only be billed for local calls dialed by our customers. There's no dispute they billed them for calls that were not local or were not dialed. Now, there was, as part of the judgment in this case, a number entered for that, wasn't there? For CORE, actually, yes. Right. In favor of CORE. And why doesn't that agreement on that number end that dispute in this case on appeal? I think CORE believes you'd have to ask Mr. Talton. You contend it does end it? In other words, there's been an adjustment for those calls and they get $250,000? The reason for that, Your Honor, in all candor, Verizon had disputed CORTEL's bills and had withheld payments of amounts it believed were due on a current basis to recoup passed over payments. We overwithheld. We overestimated the amount of passed over payments. So that final adjustment, though, but there was an agreement, sort of looks like a gross down-and-dirty agreement, just to get final judgment. But there was an agreement that seems to resolve that now, isn't it? I think it's still open to CORTEL to argue that they don't breach the agreement by billing reciprocal compensation charges for non-local third-party calls. I don't think they've actually made that argument here. So I think the arguments that they're trying to make here, yes, I think it resolves those arguments. Thank you, sir. Thank you, Your Honor. Mr. Talton. Verizon argued to this court a few moments ago that no one knew that there was an interconnection requirement before 2010. An interconnection requirement at TELRIC. An interconnection at TELRIC. The FCC brief in Talk America, which we cite on pages 8 through 9 of our reply brief, says that there was an interconnection requirement and says explicitly that this has always been there since 1996 when the Federal Communications Act was adopted. So for Verizon to say nobody knew insists that nobody has read the statute. And that's a position, I don't know how we can square that with common sense. Mr. Angstreich argues, quite forcefully, that 11.6 is the only thing you have to look at. But look at Section 4, which is the interconnection part of it. In Section 4, I direct your attention, just in passing, to Section 4.2. 4.2.1 explicitly says that these are... Section 4 describes the architecture for interconnection of the parties' facilities, and you read down, it says, traffic exchange drunks pursuant to Section 251C.2. It's an explicit incorporation of the statute that says TELRIC rates. And 11.6 is not the only way that you get TELRIC rates. It's right there, and it's in the statute. It's everywhere. You can't possibly argue that it is not in this agreement. It's in the 96 statute. Yes, the 96 statute. Did the contract allude to that in any way? Explicitly. It cites the statute over and over again. It cites it there, it cites it in 27.1. But I mean, for the point you're trying to urge, which is that there's an interconnection obligation of TELRIC rates. It cites it for interconnection under 251C.2, and 251C.2 explicitly says TELRIC rates. So it doesn't say... The word TELRIC doesn't appear in here, but those are the cost-based rates. 251C.2 are the cost-based rates. The unis are the cost-based rates. What's the language of 252C.2? 251C.2... Yeah, what's the language? I don't have a... Well, actually, I do. I'll read it to you. It says that you have to provide interconnection, quote, on rates, terms, and conditions that are just reasonable and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section, and section 252. What's that? And that has been defined as TELRIC. That's the statutory language for the TELRIC rates which are in our agreement. It doesn't... I mean, TELRIC is a... It's the industry's terms for the just reasonable and nondiscriminatory rates. What's your interpretation of why they have Section 3, unbundled, for unbundled access? Why they have Section 3 where? The Unbundled Transport Act. Oh, I'm sorry. In Section 3 in what? 251C.3. 251C.3 is unbundled access. Okay, so there's unbundled access, and then there's interconnection under C.2. You have both. And entrance facilities can be used for both, and that's what the FCC made clear in their brief in TALK America and which the Supreme Court adopted in TALK America. And that issue, by the way, TALK America wasn't the first case that even addressed this. This was addressed in 2002 in Maryland in a case called AT&T v. Verizon. Verizon was involved in when it said the same exact thing. It just took another 8 years to get up to the Supreme Court, but the same issue arose in 2002, and exactly what I'm telling you now was said by the Maryland Public Utilities Commission in 2002. So when you look at the way this whole document is cobbled together, it is clear that this document contemplated 251 would apply, and 251 has 2 parts to it, C.2. and C.3. This document references C.2. explicitly with respect to interconnection, and when it references it explicitly with respect to interconnection, it's referencing the telework rates that are in C.2.D., and when it's referencing the telework rates in C.2.D., it's setting them out in the attachment under the category unbundled transport because unbundled transport in the industry is used for both interconnection and unis, and that's how this contract is all read together. You've got to read the contract as a whole. You can't just say, look at 11.6. It's talking about unis there, yeah, but in Section 4, it's talking about interconnection. Both of them exist, and the Supreme Court has made clear that Verizon's reading of this contract is just wrong because you have the right to interconnect, and you have the right to interconnect at telework rates. Let me briefly address, if I could, the other issues. Does it address that in the remand order? In the T.R.R.O.? Yes. It addresses it explicitly in the T.R.R.O. in Section 365. I'm not sure. I believe it addresses it in the T.R.R.O. I can find it. Thank you. T.R.R.O. too. Just briefly, this issue with Cortel's facilities, there are so many issues of fact there. We have 300 pages. We put them in the record because Verizon says it never placed an order, so we put 300 pages in this. It starts on page, I think, 1201 to 1300. I'm sorry. It's somewhere in there. It ends at page 1300 of our appendix. 300 pages of orders, 1021, I'm sorry, to 1300, where Verizon ordered facilities from Cortel, said, Give us facilities, and it said, Bill us for those facilities. Write in those orders. We showed it to you. It says, Bill us in those facilities, and Cortel writes back saying, We are firmly or we give you an FOC, a firm order confirmation that we're providing those facilities. Verizon comes to the district court and says, We don't have to pay for those facilities because we quote-unquote self-provisioned. Well, all they meant is that on their side of the network they provided a facility, but they still have to get into our side of the network, and this, in fact, our ICA says explicitly the only way they can get into my client's network is through an entrance facility. The only way. That's 4.3.3. The only way is through an entrance facility. Their argument is that, Well, we built our facilities on the inside of the wall. Well, that's crazy. Why? What's wrong with that? What's wrong with that? Look at that door right there. That's an entrance facility. That door is an entrance facility, Judge. On the hall is the tunnel, and here is my client's office. What my client did is he put the, see the hinge on that door? He put the hinge on the inside because it just fit better there. They're saying that hinge is not part of the door because it's on the inside. That's exactly what their argument is. There's nothing in this record. They're saying that their own facility solves the problem, that we don't need your facility. It's on the other side. Then they can't communicate. Unless we put that door there, they can't communicate with my client's facility. We built the facility because they ordered it. That's why they ordered it. If they're right, they self-provision. Why are there 300 pages of orders to my client to provide facilities? That makes no sense. And, of course, it makes no sense, and these are the questions of fact which the district court simply said, well, I'm not looking at any of this because I don't know why the district court said it on this one. But it essentially said we don't buy any argument because they self-provisioned. Well, they only self-provisioned on that end of the hallway. They never self-provisioned on this end of the hallway. Thank you, sir. Thank you. We'll come down and greet counsel and take a brief recess.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Allyson K. Duncan